## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**PIERRE WEATHERSPOON**                          **CIVIL ACTION**

**versus**                                       **NO. 10-4500**

**N. BURL CAIN, WARDEN,**                         **SECTION: "A" (3)**
**LOUISIANA STATE PENITENTIARY**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Pierre Weatherspoon, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On July 19, 2005, he was convicted of manslaughter under

Louisiana law,[1] and he was subsequently sentenced to a term of thirty-five years imprisonment.[2] The Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence on December 12, 2006,[3] and the Louisiana Supreme Court then denied his related writ application on October 12, 2007.[4]

After seeking and being denied post-conviction relief in the state courts, petitioner filed the instant application for *habeas corpus* relief on December 2, 2010.  In support of his application, he asserts the following claims:

1. The trial court erred in allowing introduction of inadmissible evidence;

2. The trial court erred in denying a mistrial;

3. There was insufficient evidence to support petitioner's conviction;

4. Petitioner's sentence is excessive;

5. The trial court erred in failing to include all responsive verdicts; and

---

[1] State Rec., Vol. XXVI of XXVIII, transcript of July 19, 2005, p. 297; State Rec., Vol. XV of XXVIII, minute entry dated July 19, 2005; State Rec., Vol. XV of XXVIII, jury verdict form.

[2] State Rec., Vol. XXVI of XXVIII, transcript of January 18, 2006; State Rec., Vol. X of XXVIII, minute entry dated January 18, 2006.

[3] State v. Weatherspoon, 948 So.2d 215 (La. App. 5th Cir. 2006) (No. 06-KA-539); State Rec., XV of XVIII.

[4] State v. Weatherspoon, 965 So.2d 398 (La. 2007) (No. 2007-KO-0462); State Rec., Vol. X of XXVIII.

6.      Petitioner received ineffective assistance of counsel.

The state concedes that petitioner's application is timely[5] and that he has exhausted his remedies in the state courts.[6]

<u>Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002). Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." <u>Bell</u>, 535 U.S. at 694.

---

[5] Rec. Doc. 10, p. 6.

[6] Rec. Doc. 10, p. 5.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

<u>Facts</u>

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> At approximately 7:30 p.m. on June 24, 2002, Deputy Michael Buras was on patrol when he was dispatched to the 1600 block of Betty Street in Marrero to answer a call for an aggravated battery by shooting. When he arrived, he observed a black male, later identified as fourteen-year-old Lionel Williams, lying on the ground with a pool of blood around his head. The victim was removed from the scene by EMS and transported to West Jefferson General Hospital where he was pronounced dead. A later autopsy revealed the victim sustained a single gunshot wound to the back base of his head that severed his spinal cord.
> Additional units arrived at the scene, and the area was canvassed for witnesses. Deputy Buras spoke to one witness, Brandon Walker, who advised that there were four people in the car involved in the shooting and specifically named defendant, Pierre Weatherspoon, as one of the four people. The on-scene investigation revealed the car involved was a white, four-door Chevy Corsica. It was determined that the same vehicle had been involved in an altercation approximately four hours earlier at a nearby convenience store on Acres Road. During the investigation into the altercation, field identification cards (FIC) had been filled out on three subjects

who were found standing next to the Corsica, including Weatherspoon.

Several witnesses were transported from the scene of the shooting to the Detective Bureau where they gave statements. In their statements, three witnesses, Brandon Walker, Orlando Washington, and Brandon Washington, stated they saw Weatherspoon exit the car and shoot into the crowd of people playing and waiting to play basketball. All three witnesses independently identified Weatherspoon in a photographic lineup as one of the people they saw exit the vehicle and shoot into the crowd. At trial, all three witnesses confirmed their initial statements to the police. Orlando Washington and Brandon Washington also made in-court identifications of Weatherspoon as the person they saw shoot into the crowd but Brandon Walker, who was being held on a material witness bond prior to trial, stated he was unable to identify Weatherspoon in court.

On the night of the shooting, the police received information that Weatherspoon and the driver of the vehicle, who was identified as Troy Porea, were inside a room at the Moon Suite Inn on the Westbank Expressway. When the police arrived at the motel, they located the suspects in Room 211, at which time they were arrested.

At trial, Weatherspoon admitted he was in the car involved in the shooting but denied he was the one who exited the vehicle and shot into the crowd. Weatherspoon testified he was riding in a car with Troy Porea, Deantre Jackson, and Errasemus Thomas (a/k/a "Raz") when they drove down Betty Street. He stated someone threw a bottle at the car, at which time Porea stopped the car, grabbed a gun from under his seat, and stuck his arm out of the car window. According to Weatherspoon, Deantre exited the car from the back seat and started shooting while Raz leaned out of the back seat driver's side window and started shooting. Deantre returned to the car and Troy drove off. Troy drove to the end of Marshall Road where he disposed of the guns under a rug in the field. Thereafter, the four boys went to the Moon Suite Inn where Weatherspoon learned through television reports that the police were looking for suspects in the shooting. Deantre and Raz left to burn the car while Weatherspoon and Troy stayed behind in the room where they were subsequently arrested. Defendant denied any knowledge that a

shooting was going to take place and stated he was only in the car for two minutes before the incident.[7]

Evidentiary Errors

Petitioner's first claim is that the trial court erred in allowing introduction of inadmissible evidence regarding his gang affiliation and threatening telephone calls.  On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> Weatherspoon argues the trial court erred in allowing prejudicial evidence of his gang affiliation.  He maintains any evidence relating to gangs was irrelevant and violated LSA-C.E. art. 404(B), which prohibits the use of evidence to show other crimes or bad acts to show bad character of the defendant to show he acted in conformity therewith.  Weatherspoon asserts references to his gang membership were irrelevant to the shooting, which occurred when a bottle was thrown at the car and was unrelated to any gang activity.  He contends the only purpose of the gang-related testimony was to show he was a bad person and should be convicted of something. Weatherspoon also argues the trial court erred in admitting evidence that one State witness received threatening phone calls prior to trial. He claims the phone calls were never linked to him and, therefore, were irrelevant and prejudicial.
>
> Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial.[FN15]  However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule.[FN16]  Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad act.[FN17]

---

[7] <u>Weatherspoon</u>, 948 So.2d at 218-19; State Rec., Vol. XV of XXVIII.

[FN15]  LSA-C.E. art. 404B(1); <u>State v. Prieur</u>, 277 So.2d 126, 128 (La. 1973).

[FN16]  <u>State v. Dauzart</u>, 02-1187 (La. App. 5 Cir. 3/25/03), 844 So.2d 159, 165.

[FN17]  LSA-C.E. art. 404(B)(1); <u>Id</u>.

In order for other crimes evidence to be admitted under LSA-C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged.[FN18]  Further, the probative value of the extraneous evidence must outweigh its prejudicial effect.[FN19]

[FN18] <u>State v. Jackson</u>, 93-0424 (La. 10/18/93), 625 So.2d 146, 149.

[FN19]  LSA-C.E. art. 403.

The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence.[FN20]

[FN20]  <u>State v. Dauzart</u>, *supra* at 165-66 (citation omitted).

Clearly, evidence of other crimes or bad acts is prejudicial since all evidence which tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. The underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime.[FN21]  Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to LSA-C.E. art 404(B)(1) will not be disturbed.[FN22]

[FN21]  <u>State v. Williams</u>, 02-645 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 507, <u>writ denied</u>, 02-3182 (La. 4/25/03), 842 So.2d 398.

[FN22]  <u>Id</u>.

We will first address this assignment as it pertains to "gang evidence."

On the first day of trial, prior to jury voir dire, defense counsel argued that any reference to defendant's gang affiliation was irrelevant.  Defense counsel noted that the State had previously referenced defendant's membership in the GMC gang in its opening statement during the first trial and that such reference was improper evidence of other crimes or bad acts.[FN23]  After confirming that neither party intended to bring up the issue during voir dire, the trial judge proceeded with voir dire without commenting on the issue.  On the second day of trial, the trial judge expressly reminded the parties of her prior ruling on the motion in limine; specifically, that she would allow gang related information into evidence.

> [FN23]  GMC refers to the three streets, Garden, Marshall, and Carmadelle, where many of the gang members live.

Throughout trial, various references were made to the defendant's membership in the GMC gang.  During its opening statement, the State told the jurors that Weatherspoon was a member of the GMC gang and stated the evidence would show the shooting was revenge for an earlier altercation involving members of the GMC gang.  The State then presented the testimony of Deputy Harley Smith who testified about an altercation that occurred approximately three to four hours prior to the shooting.  Deputy Smith stated he investigated a fight in progress at a convenient store on Acres Road, which is two blocks over from the Betty Street projects.  He stated several subjects were involved which led him to fill out field identification cards on three subjects, one of whom was Weatherspoon.  He ultimately arrested Brandon Porea, Troy Porea's brother, for assaulting the victim, Kenez Armand.  Deputy Buras testified he learned the fight stemmed from suspicion that someone was stealing either Brandon Porea or Troy Porea's dog.

Deantre Jackson testified next and linked himself, Weatherspoon, Troy Porea, and Raz as members of the GMC gang.  Defense counsel objected to the GMC gang reference and noted it was an ongoing objection.  Deantre admitted that if something happened to a GMC boy, revenge would be sought on whoever did it.  He explained that, on the day of the shooting, two people, Kenez Armand and Jamal Taylor, were seen on the side of the fence by Troy Porea's grandmother's house trying to steal a dog.  As a result, Troy

and Deantre went looking for Kenez and Jamal to beat them up. They found them at the Acres Road store and started a fight. Defendant and Troy's brother, Brandon, showed up during the fight and Brandon was ultimately arrested.   According to Deantre, everyone was mad that Brandon was arrested and they decided to find Kenez and Jamal to seek revenge for Brandon's arrest.  Troy Porea drove Deantre, defendant, and Raz to the Betty Street project looking for Kenez at which time someone threw something at the car prompting the shooting.

References to the GMC gang were also made during the testimony of Orlando Washington, Brandon Washington, and Brandon Walker.  All three stated they knew that Weatherspoon, Troy Porea, and Raz were in the GMC gang and that none of them had any problems with the GMC gang prior to the shooting.[FN24]

[FN24]   Defense counsel again objected to the testimony relating to the GMC gang.

Additionally, Lieutenant Dennis Thornton testified that defendant, Porea, and Raz were all GMC boys.   Lieutenant Thornton's testimony related to Deantre's identification of the three boys explaining that they were associates of Deantre.  Lieutenant Thornton also made reference to the GMC gang in identifying several pictures shown to him during his testimony.  Specifically, he noted that some of the photographs contained GMC "tagging" or graffiti. These pictures were of a street leading to defendant's girlfriend's house.  There was evidence that defendant called his girlfriend after the shooting.

During defendant's testimony, he was questioned about his affiliation with the GMC.  On direct examination, defendant admitted he had a GMC tattoo.  He denied that the GMC tattoo represented a gang but, rather, stated it represented a group of friends.  Defendant denied the shooting had anything to do with gang activity.   On cross-examination, defendant was questioned about his involvement in a problem at school two years before the shooting for gang-related expression, but he denied knowledge of the circumstances of the problem.

In closing arguments, the State made brief references to the GMC gang.  It argued the shooting was about the GMC boys standing up for one another.  In rebuttal, the State argued an innocent child was dead because of defendant's need to protect his street reputation as a GMC member.

The Second Circuit has stated that

> [i]n today's society, members of gangs are not regarded as model citizens. There is inherent connotation that a gang member is involved in criminal activity. The fact that [a] defendant was a gang member could ... create an image of a bad person in the eyes of the jury.[FN25]

> [FN25]   State v. Barnes, 28,835 (La. App. 2 Cir. 12/11/96), 685 So.2d 1148, 1155.

In Barnes, the court determined evidence of the defendant's gang affiliation was prejudicial because the evidence was not relevant to any of the essential elements of the armed robbery. However, the court concluded the error was harmless. It noted there was direct evidence that placed the defendant in possession of items identified as taken in the robbery, items of clothing and a gun described by a witness, and a pantyhose mask similar to the one used in the robbery. Thus, the court determined evidence that the defendant was a gang member did not contribute to his guilty verdict.

In State v. Williams,[FN26] this Court found that the defendant's gang affiliation had independent relevance in establishing the defendant's motive and intent for second-degree murder. This Court referenced Barnes but noted that, unlike armed robbery, second-degree murder is a specific intent crime. This Court explained that the evidence showed the shooting was gang-related and involved a territorial conflict between two rival gangs. This Court concluded evidence of the defendant's gang affiliation was relevant to show his motive to specifically injure the victims, who were affiliated with a rival gang.

> [FN26] 02-645 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, writ denied, 02-3182 (La. 4/25/03), 842 So.2d 398.

In the present case, defendant had been charged with second-degree murder; thus, specific intent was an issue. The State's theory was that the shooting was a result of GMC gang members seeking revenge for an earlier altercation. The gang-related revenge evidence was relevant to show defendant's motive of specific intent

– 11 –

to injure.  Thus, we find that the admission of such evidence was not improper.

Defendant also asserts that evidence of harassing and threatening phone calls made to the Washington's home was improperly admitted.   Weatherspoon claims there was no identification of the caller or how or if the caller was linked to him and also argues that the testimony was irrelevant and highly prejudicial.

Relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[FN27]  Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[FN28]  A verdict will not be reversed because of the erroneous admission of irrelevant evidence if the reviewing court determines that the error was harmless beyond a reasonable doubt.[FN29]

[FN27]  LSA-C.E. art. 401.

[FN28]  LSA-C.E. art. 403.

[FN29]  State v. Wright, 04-1038 (La. App. 5 Cir. 2/15/05), 896 So.2d 1172, 1179.

During trial, Deputy Michael Buras, who was a responding officer to the shooting, testified that he was dispatched to the home of Schwanda Washington, Orlando and Brandon's mother, approximately three weeks after the shooting in response to a complaint of harassing phone calls.  He stated that Ms. Washington advised she had been receiving threatening phone calls from an unknown person who stated he was going to kill her.  Defense counsel objected on the basis of hearsay.  The State argued it was res gestae but the trial court did not agree.  The State attempted to pursue the questions about the phone calls but abandoned its attempt after defense counsel consistently objected.  The State ultimately settled on eliciting information about Ms. Washington's emotional state, which was described by Deputy Buras as traumatized, upset, crying, and worried for her children.

On cross-examination, defense counsel questioned Deputy Buras about the harassing phone calls.  Deputy Buras stated the caller

never identified himself and neither Orlando nor Brandon Washington heard the phone calls.

The day after Deputy Buras testified, defense counsel objected to all the testimony containing innuendos and references to threats and fear.  He argued such testimony was irrelevant and prejudicial because there was nothing identifying defendant as the source of the threats.  The objection resulted in a ruling that the tape of Ms. Washington's call to 911 was inadmissible.  Thereafter, Ms. Washington testified that her family experienced problems since her sons became involved in the case.  Before any specific details were elicited, defense counsel objected on the basis of relevance.  The objection was sustained by the trial court.

On appeal, defendant specifically challenges the reference to the threatening phone calls as irrelevant and prejudicial, which is a different ground from his contemporaneous hearsay objection at trial.  However, defendant later made clear to the trial court that his objection to evidence of the threatening phone calls was based on relevancy.  Generally, to preserve the right to seek appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error as well as the grounds for the objection.[FN30]  A new ground for an objection cannot be presented for the first time on appeal.[FN31]  However, we conclude that the defendant sufficiently raised the issue of relevancy at the trial court level even though it was not clarified until later in trial.

[FN30]  LSA-C.Cr.P. art. 841.

[FN31]   State v. Gaal, 01-376 (La. App. 5 Cir. 10/17/01), 800 So.2d 938, 949-50, writ denied, 02-2335 (La. 10/3/03), 855 So.2d 294.

After review, we find that the evidence of the threatening phone calls to the Washington household was irrelevant to the prosecution of defendant for second-degree murder.  As pointed out by defendant, there was absolutely no evidence linking the threatening phone calls to defendant.  However, we also find that the admission of this irrelevant evidence was harmless.  As stated above, the evidence against defendant was overwhelming with four eyewitnesses identifying him as the shooter.[8]

---

[8] Weatherspoon, 948 So.2d at 225-30; State Rec., Vol. XV of XXVIII.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[9]

The United States Fifth Circuit Court of Appeals has held:  "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."  Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state courts merely misapplied state law in allowing introduction of the evidence, his claim is not cognizable in this federal proceeding.

Moreover, to the extent that petitioner is arguing that the introduction of the evidence violated federal law, he has failed to demonstrate that he is entitled to *habeas* relief on that basis. The United States Fifth Circuit Court of Appeals has noted:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause.  The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

In the instant case, even if the evidence at issue was wrongly admitted, it simply cannot be said to have played a crucial, critical, and highly significant role in petitioner's conviction. It cannot reasonably be argued that petitioner's conviction was based on the jurors' assessment of his character or his other bad acts; rather, the verdict here was instead clearly attributable to

---

[9] Weatherspoon, 965 So.2d 398; State Rec., Vol. X of XXVIII.

overwhelming eyewitness testimony identifying him as the killer.[10]  Therefore, petitioner has failed

to establish that the admission of this evidence resulted in a denial of fundamental fairness.

Accordingly, this claim should be denied.

Denial of Mistrial

Petitioner next claims that the trial court erred in denying a motion for mistrial.  On

direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> Weatherspoon next asserts that the trial court erred in failing to grant
> a mistrial when a State witness, Deantre Jackson, testified he took a
> lie detector test that showed he was not lying about his participation
> in the shooting or, specifically, that he did not shoot a gun during the
> incident.   Defendant argues that lie detector test results are
> inadmissible for any purpose and contends that Deantre's reference
> to the results of his lie detector test required a mistrial.  He maintains
> Deantre's testimony was crucial to the State's case and that his
> credibility was at issue because he continuously lied to the police in
> several of his statements.  Defendant argues the jury's knowledge of
> Deantre's lie detector test results impermissibly swayed its opinion
> that Deantre was credible.
>       Defendant is correct in his assertion that the results of a
> polygraph examination are inadmissible for any purpose at a criminal
> trial.[FN32]  In State v. Legrand, supra, the Louisiana Supreme Court
> stated that the rule excluding polygraph evidence "operates to prevent
> any reference during trial to the fact that a witness has taken a
> polygraph examination with respect to the subject matter of his
> testimony."[FN33]  The supreme court explained that such evidence
> is prohibited because it "invites a probable inference by the jury that
> the witness passed the polygraph examination and therefore is
> testifying truthfully," thereby usurping the jury's prerogative on a
> question involving credibility.[FN34]  The supreme court further
> noted that polygraph information and test results are inadmissible

---

[10] One could even argue that, despite their knowledge of his gang affiliation and the alleged threats, the jurors were unaffected by this evidence and obviously did not view petitioner as a hardened criminal.  After all, they chose to convict him of only manslaughter rather than the more serious charge of second-degree murder.

"either as substantive evidence or as relating to the credibility of a party or witness."[FN35]

> [FN32] See, State v. Legrand, 02-1462 (La. 12/3/03), 864 So.2d 89, 98, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005).

> [FN33] State v. Legrand, *supra*, citing State v. Hocum, 456 So.2d 602, 604 (La. 1984); State v. Tonubbee, 420 So.2d 126, 132 (La. 1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); State v. Davis, 407 So.2d 702, 706 (La. 1981); State v. Catanese, 368 So.2d 975, 981 (La. 1979).

> [FN34] Id., quoting State v. Hocum, 456 So.2d 602, 604-05 (La. 1984); State v. Davis, 407 So.2d 702, 706 (La. 1981).

> [FN35] State v. Legrand, *supra* at 98, quoting State v. Humphrey, 445 So.2d 1155, 1158 (La. 1984).

An impermissible reference to a polygraph during a criminal trial does not require a reversal unless there is a reasonable possibility that the error complained of might have contributed to the conviction.[FN36]

> [FN36] State v. Legrand, *supra* at 98.

Prior to trial, discussions were had between the parties regarding Deantre's polygraph examination.  Specifically, defense counsel wanted to ensure that there would be no testimony referencing the polygraph.   The prosecutor acknowledged the prohibition against such testimony and stated to the court that he had advised his witnesses against mentioning the polygraph.  He even stated he was glad defense counsel was aware of the prohibition so that defense counsel could "tender or tailor his cross-examination accordingly."

At trial, defendant challenged Deantre's credibility by vigorously questioning Deantre, during cross-examination, about the alleged deal he received in exchange for his trial testimony and the inconsistencies in his prior statements and testimony.  Deantre

testified he was initially charged with murder but pled guilty to manslaughter in juvenile court.  He stated he agreed to tell the truth and testify in court against the other three occupants of the vehicle.

During cross-examination, Deantre admitted that he lied in his initial statement to the police and in his testimony at prior court hearings about numerous things relating to the incident.  He explained he was young, age 16, and scared and did not want to "rat" on his friends.  He also admitted that he lied to protect himself. Examples of his lies included his statement to the police about getting out of the car after the shooting and being picked up by his mother on the street, stating he did not know guns were in the car before the shooting, stating that Troy Porea never got out of the car and did not have a gun, testifying at a prior hearing that he did not see defendant with a gun, and executing an affidavit that contained information that was not true.

After many questions about Deantre's inconsistent statements and testimony, defense counsel turned his focus to the defense's theory that it "paid" Deantre to lie about whether he possessed a gun at the time of the incident.  Deantre ultimately responded to defense counsel's questioning by stating he had taken a lie detector test.  The following exchange occurred:

> Q.  Did anybody in that car know Lionel was going to be shot?
>
> A.  I don't know.  I'm not them.  I know I didn't know he was going to get shot.
>
> Q.  But you were in a car that you claim was filled with people going out looking for revenge; that's your story today, right?
>
> A.  Yes.
>
> Q.  And you stayed in that car?
>
> A.  Yes.
>
> Q.  You didn't get out of the car?
>
> A.  No, sir.

Q.  And your testimony today is now that you know they all had guns?

A.  Yes, sir.

Q.  And of course, you're the only one without a gun, aren't you?

A.  Yes, sir.  I did not have no gun.

Q.  And that paid to not have a gun, didn't it?

A.  Excuse me?

Q.  It paid not to have a gun, didn't it?

A.  Yes, it did.

Q.  Or at least it paid to say you didn't have a gun?

A.  Oh, it paid that I did not have no gun.

Q.  It pays both ways, doesn't it?

A.  I did not have no gun.

Q.  Doesn't it pay both ways?

A.  I did not have no gun.

Q.  Sir, I asked you-

      THE COURT:

        Answer his question, sir.

      [DEFENSE COUNSEL]:

Q.  Regardless of whether you had a gun or-

      [PROSECUTOR]:

Well, I object to the question because I don't understand the question.

[DEFENSE COUNSEL]:

Well, I'll rephrase it.

[DEFENSE COUNSEL]:

Q. Regardless of whether you really had a gun or not, and you really shot or you didn't shoot, it paid to say you didn't have a gun, didn't it?

A. It did – if that's what you said it paid, I done went and took lie detector tests-

Defense counsel immediately requested to approach the bench where he requested a mistrial out of the jury's hearing. The State argued the response was unintentional and was the result of defense counsel's continued questioning and badgering of the witness. The trial court agreed and denied defendant's request for a mistrial. The trial court offered to admonish the jury but defense counsel expressed reluctance to an admonishment and the trial court ultimately refrained from such action.

Before cross-examination resumed, the trial court instructed Deantre, outside the jury's presence, not to mention the polygraph test. Deantre stated he did not remember being previously instructed not to talk about the polygraph test. The polygraph was not mentioned at any other time during the six-day trial.[FN37]

> [FN37] Of note, Lieutenant Dennis Thornton testified that "other steps" were taken to verify that Deantre was telling the truth prior to allowing him to plead. Defense counsel immediately requested a bench conference wherein he expressed his "problem" with the current line of questioning. An accord was seemingly reached when the prosecutor agreed to relate the reference to "other steps" to the photo lineup of Deantre that was shown to Brandon Walker, who identified Deantre as an occupant of the vehicle but stated Deantre did not exit or shoot into the

crowd.  Defendant does not challenge this testimony on appeal.

In <u>State v. Matthews</u>,[FN38] the supreme court did not find reversible error when the victim of an armed robbery testified that he had taken a lie detector test.  At trial, defense counsel questioned the victim about inconsistencies between his trial testimony and earlier testimony he had given at a motion to suppress hearing.  In the course of explaining the inconsistency, the victim stated he was confused with another incident where he was unable to identify anyone from photographs.  He then mentioned, in referencing the other incident, that he had taken a lie detector test.  Defense counsel argued the victim tried to bolster the veracity of his testimony by referencing the lie detector test and that it severely prejudiced him because there was some doubt a robbery occurred.  The supreme court disagreed finding there was no doubt a robbery had taken place and found the defendant was not prejudiced by the victim's gratuitous remark referencing the lie detector test.

[FN38]  322 So.2d 159 (La. 1975).

Also, in <u>State v. Legrand</u>,[FN39] no reversible error was found in the sentencing phase of trial despite the State's principal witness testifying he had passed a polygraph examination and despite the fact no admonishment was given to the jury.  The witness testified he had been arrested for being an accessory after the fact to murder but had pled guilty to a reduced charge and had yet to be sentenced.  He also admitted having other pending charges that had yet to be resolved.  Defense counsel questioned the witness in an attempt to establish he was altering parts of his testimony in order to receive favorable treatment in his own case.  In response to the vigorous questioning, the witness stated the reduced charge was offered after he took a polygraph test, which revealed he was telling the truth about not participating in the killing of the victim.

[FN39]  02-1462 (La. 12/3/03), 864 So.2d 89, <u>cert. denied</u>, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523, (2005).

The Louisiana Supreme Court noted that the witness' mention of the polygraph test was in response to the defense attorney repeatedly asking him about the fact less serious charges were

accepted by the State.  The supreme court observed that the witness simply offered what he believed to be the reason the charges against him were lessened.  The court also found that the witness' full response, that he was telling the truth in that he did not help the defendant kill the victim, clarified that the polygraph related only to the witness' lack of participation in the murder, which was not a fact genuinely at issue.

Furthermore, the supreme court found the witness' testimony was far from the only evidence of the defendant's guilt and noted that the other evidence was overwhelming.  The court noted the remarks about the polygraph exam were made during the sentencing phase and concluded that any error was harmless because of the overwhelming evidence of the defendant's guilt.

In the present case, as in Legrand, Deantre's remark that he had taken a polygraph test was in response to defense counsel's relentless attempt to establish Deantre lied about his involvement in the incident in order to broker a plea agreement with the State. Deantre's reference to the polygraph test was his attempt to explain why he believed he did not receive a "deal" in exchange for his testimony against defendant:  the fact he did not possess a gun during the incident.

Whether Deantre was armed at the time of the incident was challenged by defendant who testified that Deantre was one of the shooters.  However, none of the other evidence suggested Deantre was armed at the time of the incident.  None of the three eyewitnesses to the shooting identified Deantre as one of the shooters.  In fact, Brandon Washington specifically testified that he saw Deantre in the car but that he did not see Deantre get out of the car and shoot.  Thus, that portion of Deantre's testimony about not possessing a gun at the time of the shooting was corroborated by other evidence and his reference to taking a polygraph examination in connection with that fact was not prejudicial to defendant.

Because of the overwhelming evidence of defendant's guilt, it cannot be said that any remarks about the polygraph examination might have contributed to defendant's conviction.  Therefore, we find that trial court properly denied defendant's motion for a mistrial.[11]

---

[11] Weatherspoon, 948 So.2d at 230-33; State Rec., Vol. XV of XXVIII.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[12]

To the extent that petitioner is arguing that the state court erred in applying the state laws concerning the grant or denial of a mistrial, such a claim is not cognizable in a federal *habeas corpus* proceeding.  "'[I]t is not the province of a federal *habeas* court to reexamine state-court determinations on state-law questions.'"  Trevino v. Johnson, 168 F.3d 173, 184 (5th Cir. 1999) (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).  Further, even if the state courts in fact misapplied state law, that would be of no moment in this proceeding.  Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983); Thomas v. Ieyoub, No. 93-3757, 1994 WL 286198, at *2 (5th Cir. June 22, 1994) ("[E]rrors of state law, such as a denial of a mistrial, must rise to a constitutional dimension in order to merit habeas relief."); Smith v. Whitley, No. 93-03208, 1994 WL 83777, at *1 (5th Cir. Mar. 3, 1994) ("Even if the court's refusal to declare a mistrial was a violation of Louisiana law, we, as a federal habeas court, are without authority to correct a simple misapplication of state law; we may intervene only to correct errors of constitutional significance."); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *25 (E.D. La. May 7, 2009), aff'd, 359 Fed. App'x 462 (5th Cir. 2009), cert. denied, 130 S.Ct. 2107 (2010); Talley v. Cain, Civ. Action No. 08-3542, 2009 WL 916331, at *15 (E.D. La. Apr. 6, 2009).

---

[12] Weatherspoon, 965 So.2d 398; State Rec., Vol. X of XXVIII.

Moreover, it is clear there that petitioner's federal constitutional right to a fair trial was not violated by the witness's comment.  As previously noted, a petitioner cannot be granted federal *habeas* relief on the ground that his trial was rendered fundamentally unfair by an evidentiary error unless the evidence at issue played a crucial, critical and highly significant role in the trial. Lucas v. Johnson, 132 F.3d 1069, 1079 (5th Cir. 1998).  Relief simply is not warranted where, as here, (1) the evidence at issue was a nonresponsive, unanticipated, and fleeting remark made by a testifying witness,[13] (2) the remark was not highlighted by further questioning or in argument,  (3) defense counsel did not seek an admonishment or curative instruction for strategic reasons,[14] and (4) there is no reason to believe that the remark had any impact on the conviction in light of the overwhelming evidence of guilt.  See, e.g., United States v. Jackson, No. 98-31091, 1999 WL 706084, at *4 (5th Cir. Aug. 17, 1999); Talley, 2009 WL 916331, at *15.[15]  Accordingly, the trial court's denial of the motion for mistrial did not violate federal constitutional law.

---

[13] The Court expressly notes that a witness's unsolicited, isolated comment during his testimony that he has taken a lie detector test does not normally warrant the granting of a mistrial.  See, e.g., Thornburg v. Mullin, 422 F.3d 1113, 1125 (10th Cir. 2005); United States v. Mylett, No. 94-20917, 1995 WL 727010 (5th Cir. Nov. 21, 1995); Escobar v. O'Leary, 943 F.2d 711, 720-21 (7th Cir. 1991); United States v. Walton, 908 F.2d 1289, 1293 (6th Cir. 1990).

[14] See State Rec., Vol. XXIII of XXVIII, transcript of July 14, 2005, p. 177 (defense counsel expressed concern that a curative instruction would only draw the jurors' attention to the comment).

[15] This is especially true in light of the fact that there is a question as to whether the jurors even heard or understood the comment.  For example, the trial judge expressed such a doubt on the record:  "This witness is very difficult to understand.  And frankly, when I heard him answer the question, I thought he said he would take a polygraph test and maybe that's what the jury heard or did not hear.  That's what I thought I heard."  State Rec., Vol. XIII of XXVIII, transcript of July 14, 2005, pp. 182-83.

<u>Sufficiency of the Evidence</u>

Petitioner next claims that there was insufficient evidence to support his conviction.

On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> Weatherspoon asserts that the evidence was insufficient to support the conviction[FN3] for manslaughter because the State failed to prove his identity as the shooter beyond a reasonable doubt.  He further asserts that the only witnesses who identified him as the shooter were not credible.  Weatherspoon maintains that three of the witnesses, Brandon Walker, Orlando Washington, and Brandon Washington, had a long history of problems with him and argues they gave conflicting statements, some which contained internal inconsistencies.  He alleges that a fourth witness, Deantre Jackson, gave several different statements and was given a deal in exchange for his trial testimony.  Weatherspoon contends the only unbiased witness, Autrelle White, did not identify him as the shooter.
>
>> [FN3] Although a motion for post-verdict judgment of acquittal was not filed by defendant in this case, the Louisiana Supreme Court has recognized that the issue of sufficiency of the evidence is properly reviewed on appeal even in the absence of a motion for post-verdict judgment of acquittal.  <u>See</u>, <u>State v. Marcantel</u>, 00-1629 (La. 4/3/02), 815 So.2d 50, 56, fn. 2; <u>State v. Hensley</u>, 04-617 (La. App. 5 Cir. 3/1/05), 900 So.2d 1, 6, fn. 1, <u>writ denied</u>, 05-0823 (La. 6/17/05), 904 So.2d 683.
>
>> The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. [FN4]   In addition to proving the statutory elements of the charged offense at trial, the State is required to prove defendant's identity as the perpetrator.[FN5]  Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.[FN6]

– 24 –

[FN4]  Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

[FN5]  State v. Ingram, 04-551 (La. App. 5 Cir. 10/26/04), 888 So.2d 923, 926.

[FN6]  Id.

Weatherspoon does not argue that the State failed to establish any of the essential statutory elements of his conviction, but only contends the State failed to prove beyond a reasonable doubt his identity as the offender. Therefore, we will not address the sufficiency of the evidence with respect to the statutory elements of manslaughter.[FN7]

[FN7]  State v. King, 05-553 (La. App. 5 Cir. 1/31/06), 922 So.2d 1207, 1212.

Four State witnesses, Brandon Walker, Orlando Washington, Brandon Washington, and Deantre Jackson, identified defendant as the person who exited the vehicle armed with a gun and shot into a crowd of people gathered near the basketball courts on Betty Street. Immediately after the shooting, while still at the scene, Brandon Walker told the police he saw defendant get out of the car and shoot into the crowd. Walker went to the Detective Bureau, where he gave a statement. At 10:16 p.m., on the night of the shooting, Brandon Walker identified Weatherspoon in a photographic lineup as the person who exited the front passenger seat of the car and who fired shots into the crowd.

After being held in jail for six months on a material witness bond, Brandon Walker testified at trial. His trial testimony corroborated his earlier statement to the police. He testified he was on Betty Street at the time of the shooting getting his hair "plaited" when he saw a white Corsica belonging to Troy Porea pass around the neighborhood four or five times. Walker testified that the car stopped and Porea exited the driver's side of the vehicle and said something as he walked toward the back of the car. Walker stated he then saw Pierre Weatherspoon get out of the car, walk to the back of the car with a gun, and open fire on the crowd. He stated that he recognized Pierre because he knew him from the neighborhood.

During his testimony, Walker stated he did not see Weatherspoon in the courtroom. Thereafter, Walker was shown the

– 25 –

same photographic lineup containing defendant that he had been shown on the night of the shooting. Walker admitted that he had identified Weatherspoon in the photographic lineup and that he had signed and dated the back of Weatherspoon's photo. Walker testified he was 100 percent certain the person he identified in the photographic lineup was the person he saw exit the front passenger side of the car and fire into the crowd.

Walker explained he was on the passenger side of the Corsica, on the opposite side of the street as the crowd, at the time of the shooting. He stated that his view was unobstructed and that he saw Weatherspoon exit from the passenger side of the vehicle. Walker also testified that he saw Weatherspoon's face the entire time.

Orlando and Brandon Washington are brothers who were present in the crowd at the time of the shooting.[FN8]  Both were taken directly from the scene to the Detective Bureau where they gave statements. At the time of his statement, Orlando was fifteen years old and was a friend of the victim. He told the police he saw Weatherspoon shoot into the crowd and was able to identify defendant in a photographic lineup that same night.

> [FN8]  Orlando and Brandon Washington are cousins
> to Brandon Walker and Troy Porea.

During his trial testimony, Orlando Washington testified that the shooting started after Jamal Taylor threw something at the passing car.[FN9]  He stated that Troy Porea, the driver, exited the vehicle and asked who hit his car. Washington then saw Weatherspoon get out of the passenger side, walk toward the back of the car, and shoot toward the crowd. He also saw another passenger of the car, Raz, shoot into the crowd. Washington identified Weatherspoon in court as the person he saw shoot a gun into the crowd that resulted in the victim's death. Washington explained that he knew Weatherspoon from school and had known him for approximately two years prior to the shooting.

> [FN9]  In his testimony, Orlando identifies Jamal only
> by his first name. A review of the record reveals
> Jamal's last name is Jamal Taylor.

On cross-examination, Washington admitted he did not see where defendant exited the vehicle, despite telling the police in his initial statement, as well as in his testimony from a previous hearing,

– 26 –

that Weatherspoon exited from the back passenger side.  He explained he was focused on Troy Porea and did not see defendant actually exit the vehicle.  Washington stated that the defendant was the only person on the passenger side of the vehicle and that defendant shot from the back passenger side of the vehicle. Washington testified he was shaken up at the time of his statement.

Orlando's younger brother, Brandon Washington, also gave a statement to the police on the night of the shooting.  Brandon Washington, who had just turned fourteen years old at the time, told the police he saw defendant shoot into the crowd.  He explained that Weatherspoon had been in the back passenger seat and exited to the passenger side of the vehicle.  He also told the police that he saw another back seat passenger, later identified as Raz, shoot into the crowd.  On the same night, Brandon identified defendant and Raz in a photographic lineup.  He also identified another occupant of the vehicle, Deantre Jackson, in a photographic lineup shown to him approximately two weeks after the shooting.  He testified that he saw Deantre in the back seat of the vehicle but stated he did not see Deantre get out of the vehicle or shoot.

At trial, Brandon testified that he saw the occupants of the vehicle when it stopped after Jamal hit the vehicle with a bike peg. He stated that Troy Porea exited the car first, followed by defendant on the passenger side, and then Raz on the driver's side.  Brandon explained that Weatherspoon started shooting as he walked toward the back of the car.  Brandon stated he had an unobstructed view while he hid behind a car and peeked around it.  He testified he knew Weatherspoon from "around the area."  Brandon identified Weatherspoon in court as the person he was 100 percent sure exited the vehicle on the passenger side and fired a weapon into the crowd.

The testimony of Deantre Jackson was also offered to prove defendant's identity as the perpetrator.  Deantre was arrested the day after the shooting on unrelated charges, at which time he gave a statement implicating defendant, Troy Porea, and Raz in the shooting.[FN10]  At trial, Deantre explained he was in the vehicle involved in the shooting at the time of the incident.

> [FN10] Deantre had been arrested for possession of cocaine and theft of a firearm.

In his June 25, 2002 statement, Deantre implicated Weatherspoon and Raz as the shooters.  Deantre told the police Troy Porea stopped the car and got out to see what had hit the car when

Weatherspoon and Raz hopped out and started shooting.  He stated that Weatherspoon was sitting in the front passenger seat when he exited the vehicle and fired a weapon into the crowd.  Deantre explained he was sitting behind Weatherspoon in the back passenger seat next to Raz.  Deantre denied that he got out of the car, shot into the crowd, or that he even possessed a gun at the time of the incident.  He identified Weatherspoon, Porea, and Raz in a photographic lineup at the time of his statement.  At trial, Deantre corroborated his earlier statement and testified that Weatherspoon exited the front passenger seat, walked to the rear of the passenger side of the car, and started shooting into the crowd.

Weatherspoon presented the testimony of Autrelle White, who did not identify defendant as the shooter.  At the time of the shooting, Ms. White, who lived on Betty Street, was sitting in a parked truck on the street.  She testified she saw a bottle hit the offending car and saw the driver lean out of the window and shoot into the crowd.  She also saw the two back seat riders shoot.  Ms. White stated the front seat passenger did not exit the vehicle or fire any weapon.  She explained that she witnessed the incident from approximately 20-27 feet away.  Ms. White testified that she gave a statement to the police immediately after the shooting and indicated she could identify the perpetrators.  She stated she was not shown photographs until approximately three years later and was unable to identify anyone.  Ms. White testified that defendant, as he was identified in court, did not get out of the car and fire into the crowd.  Although Weatherspoon maintains Ms. White was the only unbiased witness, she stated at trial that she knows "his people."

Ms. White stated she had been in jail from January 2003 until February 2005.  On cross-examination, she admitted that the prosecutor visited her shortly after she was released from jail and questioned her about the shooting at which time she told him she had "jail block" and could not remember people.

Weatherspoon maintains that all four identifications by the State's witnesses were wrought with inconsistencies and could not be used to prove his identity as the shooter beyond a reasonable doubt.  He also challenges the credibility of Deantre, claiming he was given a deal in exchange for his testimony.

When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness.[FN11]  It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence.[FN12]

[FN11]   State v. Bailey, 04-85 (La. App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La. 11/15/04), 887 So.2d 476.

[FN12]   Id.

Weatherspoon first challenges the discrepancy in the evidence regarding his location in the vehicle and the location of the shooters as described by the witnesses.  He points out that both Brandon Walker and Deantre Jackson testified he was the front seat passenger, a fact that Weatherspoon admitted in his own testimony.  He notes that Autrelle White testified the front passenger did not shoot.

Weatherspoon further challenges the identifications made by Orlando Washington and Brandon Washington on the basis they testified it was the two back seat passengers who jumped out and started shooting.  He contends the evidence showed he was a front seat passenger and, therefore, there was a reasonable probability that Orlando Washington and Brandon Washington misidentified him as the shooter.

In their initial statements to the police, Orlando Washington and Brandon Washington stated defendant exited the back passenger seat of the vehicle.  At trial, Orlando clarified that he did not see defendant actually exit the car but saw defendant shoot from the back passenger side.  Brandon Washington clarified at trial that defendant exited the vehicle from the passenger side and shot while standing at the back passenger side of the car.

Although there may have been slight confusion as to whether Weatherspoon was sitting in the front or back passenger seat of the vehicle, the record shows that Brandon Walker, Orlando Washington, and Brandon Washington all testified they saw defendant exit on the passenger side of the car and walk to the back passenger side of the car where he started shooting into the crowd.  Furthermore, all three eyewitnesses stated that they clearly saw defendant's face and identified him as the shooter in a photographic lineup shortly after the incident.  Even though Brandon Walker refused to identify Weatherspoon in court as the shooter, the jury was able to review the photographic lineup where Brandon Walker identified defendant and conclude it was the same person sitting in court.  At trial, Walker re-affirmed the identification of Weatherspoon he made in the photographic lineup.

Weatherspoon also points out inconsistencies among the State's witnesses regarding the number of people they saw in the car

and the number of times the car passed Betty Street before the shooting occurred. Such minor discrepancies are not unusual when the same event is recounted by different people. Despite these slight discrepancies in the witness's accounts of the events surrounding the shooting, their statements were consistent concerning the material facts of the shooting.

Weatherspoon next challenges the credibility of Brandon Walker, Orlando Washington, and Brandon Washington on the basis they had a long history of problems with him, thereby suggesting they fingered him as the shooter out of revenge. We find that nothing in the record supports defendant's assertion. In fact, Orlando and Brandon Washington testified they had no problems with defendant and Orlando specifically stated he and defendant were not enemies.

Defendant also challenges the credibility of Deantre Jackson on the basis he received a deal in exchange for his testimony against defendant. Defense counsel made the jury fully aware of Deantre's agreement with the State. Deantre was initially charged with second-degree murder and ultimately pled guilty to manslaughter in juvenile court. He was sentenced to juvenile life but was paroled, over the State's objection, after serving two years. At the time of trial, Deantre had been released from his parole, again over the State's objection.

The State presented the testimony of witnesses from the District Attorney's office involved in the screening of the charges against Deantre to rebut defendant's claim that Deantre received a deal in exchange for his testimony. The record shows that Deantre was allowed to plead guilty to manslaughter because no one identified Deantre as the shooter and he was the least culpable of the four occupants of the vehicle.

Defendant further argues that Deantre was not credible because his version of the facts surrounding the shooting differed in each statement and testimony he gave. Defense counsel more than adequately pointed out all of the inconsistencies to the jury, most of which pertained to Deantre's statements regarding Troy Porea's involvement in the shooting. For example, at trial, Deantre stated that Porea was armed but did not get out of the car. However, he initially told police that Porea was not armed and that he did get out of the car. Deantre admitted he lied about Porea's involvement and explained that Porea was one of his closest friends and he did want to be labeled a "rat."

Some other inconsistencies pointed out by defendant include Deantre's initial statement to the police that he was immediately

dropped off after the shooting and that his mother picked him up and drove him home; that he did not see defendant, Troy, or Raz after they drove off; and that he had no knowledge of how the car got burned.   At trial, Deantre admitted he had previously lied.   He explained he went with defendant, Troy, and Raz to the Moon Suite Motel after the shooting.   Deantre then admitted his personal involvement in burning the car.

The record shows Deantre's testimony pertaining to defendant's involvement as the shooter has always been consistent. In his statement to the police, his subsequent affidavit, his testimony at the motion to suppress hearing, and at trial, Deantre always stated that he saw defendant shoot a gun into the crowd.   Additionally, that portion of Deantre's testimony was corroborated by three other eyewitnesses who all consistently testified that defendant exited the passenger side of the vehicle, walked to the back of the vehicle, and fired into the crowd.

Similar cases have upheld convictions based on similar issues pertaining to identification evidence.   In State v. Hooker,[FN13] this Court upheld the sufficiency of the evidence as it related to the defendant's identity in a second-degree murder conviction.   The defendant argued the only evidence identifying him as the shooter was the perjured testimony of a co-defendant who was given a deal in exchange for his testimony and of another witness who lied several times regarding what he saw.   This Court noted the testimony of the eyewitnesses corroborated one another.   It also noted that although one witness changed his story and stated he did not know who shot the victim, the jury could have reasonably found the witness did so only because he had been threatened and was scared.   This Court explained the evidence did not show the witness had reason to lie regarding the identity of the shooter.   This Court further found that, although the defendant had claimed his co-defendant had been the shooter, the jury obviously rejected that testimony and found the State's witnesses to be more credible.

[FN13]  05-251 (La. App. 5 Cir. 1/17/06), 921 So.2d 1066.

Likewise, in the present case, nothing in the present record demonstrates Brandon Walker, Orlando Washington, or Brandon Washington had reason to lie in identifying defendant as the shooter. And, although defendant claimed Deantre was the shooter, the jury

rejected his testimony and found the State's witnesses to be more credible.

In State v. Weaver,[FN14] this Court found sufficient identification evidence for a second-degree murder conviction despite the fact identification was made by a witness who gave several different statements to the police and was a self-proclaimed liar at trial. Stating that the credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, this Court concluded the jury chose to believe the witness' testimony despite some discrepancies in her statement. This Court noted it was not unreasonable for the jury to excuse the discrepancies because the witness was a juvenile and was afraid. This Court further emphasized that the witness' earlier testimony implicated the defendant as being at the scene and armed with a gun during the commission of a felony even though her explanation of the incident differed from that of other witnesses.

[FN14] 05-169 (La. App. 5 Cir. 11/29/05), 917 So.2d 600.

In the present case, the jury was presented all the evidence and was made fully aware of the inconsistencies within some witnesses' statements. The jury weighed the evidence and determined the credibility of the witnesses. It was not unreasonable for the jury to excuse some of the discrepancies as inconsequential. The identification of Weatherspoon the shooter who shot into the crowd from the back passenger side of the vehicle was consistent among the State's witnesses. Viewing the evidence in a light most favorable to the prosecution, we find that the State proved defendant's identity as the perpetrator of the offense beyond a reasonable doubt.[16]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[17]

---

[16] Weatherspoon, 948 So.2d at 219-25; State Rec., Vol. XV of XXVIII.

[17] Weatherspoon, 965 So.2d 398; State Rec., Vol. X of XXVIII.

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that petitioner has made no such showing.

Under federal law, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).  Moreover,  Louisiana's circumstantial evidence standard requiring that the every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La.

–  33  –

Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010).

Further, where, as here, a petitioner's insufficient evidence claim is based on the credibility of the witnesses, a federal *habeas* court generally will not grant relief.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson [v. Virginia, 443 U.S. 307 (1979)], the assessment of the credibility of witnesses is generally beyond the scope of review ."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the Jackson standard for habeas relief."); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

For the reasons noted by the state court, the evidence presented in the instant case, including the compelling eyewitness accounts provided by numerous witnesses, viewed in the light most favorable to the prosecution, was clearly sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt.  Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, this Court should defer to the state court's decision rejecting that claim.

<u>Excessive Sentence</u>

Petitioner next claims that his sentence is excessive.  On direct appeal, the Louisiana

Fifth Circuit Court of Appeal rejected that claim, holding:

> Weatherspoon argues that his thirty-five-year sentence for manslaughter is excessive considering his youthful age of sixteen at the time of the shooting, his seventh grade education, and his low IQ, which is considered borderline mildly retarded.  He contends the trial court failed to give adequate weight to mitigating factors by failing to consider his mental status, which included attention deficit disorder and oppositional defiant disorder.  Defendant also asserts the trial court failed to consider the various medications he was taking, his history of marijuana abuse, and the fact he repeated seventh grade three times.
>
> It is noted that defendant failed to orally object to his sentence or file a motion for reconsideration of sentence as required by LSA-C.Cr.P. art. 881.1.[FN40]  Defendant's failure to object to his sentence or to move for reconsideration of his sentence limits him to a bare review of the sentence for constitutional excessiveness on appeal.[FN41]

>> [FN40] LSA-C.Cr.P. art. 881.1(E) provides, "Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude ... the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review."

>> [FN41]  <u>State v. Hebert</u>, 05-1004 (La. App. 5 Cir. 4/25/06), 930 So.2d 1039, 1049.

> The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment.  A sentence is considered excessive, even when it is within the applicable statutory range, if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.[FN42]

[FN42]  State v. Wickem, 99-1261 (La. App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La. 2/16/01), 785 So.2d 839.

In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock our sense of justice.  The trial judge is afforded wide discretion in determining sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed.[FN43]  The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate.[FN44]  In reviewing a trial court's sentencing discretion, three factors are considered:  1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.[FN45] There is no requirement that specific matters be given any particular weight at sentencing.[FN46]

[FN43]  State v. Brown, 04-230 (La. App. 5 Cir. 7/27/04), 880 So.2d 899, 902.

[FN44]  Id.

[FN45]  Id.

[FN46]  State v. Magee, 05-171 (La. App. 5 Cir. 10/6/05), 916 So.2d 1178, 1185, writs denied, 06-0461 and 06-0464 (La. 9/22/06), 937 So.2d 377.

Weatherspoon was convicted of manslaughter, which is punishable by not more than forty years.[FN47]  Defendant received a near maximum sentence of thirty-five years.  At his sentencing hearing, defendant presented the testimony of Dr. Christine Powanda, a psychologist, who had evaluated defendant one year before the shooting in connection with his involvement with juvenile court and for trouble in school and at home.  Dr. Powanda stated she had no independent recollection of defendant and that, other than her report, she had no notes or tests to review.  She testified she had no knowledge of defendant's behavior since his April 2001 evaluation and was unaware of his pending charge.

[FN47]  LSA-R.S. 14:31.

Dr. Powanda testified she had diagnosed defendant with attention deficit disorder (ADD) and oppositional defiant disorder. She stated defendant's verbal IQ was 73, which is borderline intelligence, and his performance IQ was 52, which was within the range for mild mental retardation.  Dr. Powanda stated defendant's overall IQ was 60, which put him within the mild range of mental retardation.  She explained defendant had a problem with impulse control during the evaluation, which could have affected the results of his IQ tests.  She also stated that defendant's effort level during the evaluation was fair and that he was probably capable of doing better. Dr. Powanda testified defendant's school records showed he was placed in regular classes but noted placement in special education varies from school to school.  She could not answer whether there is a correlation between a low IQ and behavioral problems.

In addition to Dr. Powanda's testimony, the trial court heard statements from the victim's mother and grandmother.  When sentencing defendant, the trial judge expressed her concerns with Dr. Powanda's testimony.  She noted Dr. Powanda did not remember defendant, did not remember much about the evaluation, and had no notes pertaining to the evaluation except her brief report.  The trial judge further noted Dr. Powanda's evaluation was conducted in a span of two and a half to three and a half hours and that Dr. Powanda herself thought defendant's IQ was probably higher than the report reflected.  The trial judge also noted the fact defendant was not placed in special education classes within the school system.  The trial judge further noted defendant handled himself extremely well at trial, "both as a result of the direct and of the cross-examination, better than anyone I can imagine who perhaps has an IQ of 65 or 55. He was almost well spoken."

In imposing the thirty-five-year sentence, the trial judge specifically considered defendant's age of sixteen but stated she was concerned that he committed the present offense at such a youthful age.  She questioned whether society could expect worse offenses from defendant as he grew older.  The trial judge ultimately focused on the death of the victim, stating he was a child who would never be able to grow up.

In State v. Bowman,[FN48] the Fourth Circuit upheld a thirty-three-year sentence for a sixteen-year-old defendant who was convicted of manslaughter.  The defendant, a first-time offender, had been charged with second-degree murder as a principal in a drive-by

shooting in which the defendant drove the vehicle from which the fatal shot was fired.  The Fourth Circuit found the trial court specifically considered several mitigating factors, including the defendant's age, the fact he was a principal to the crime, and the fact the jury returned a responsive verdict, which reflected the reduced culpability of the defendant.  Noting that the defendant was a principal to a drive-by shooting that resulted in the death of one person and that the shooting occurred without any provocation, the court did not find the thirty-three-year sentence to be excessive.

> [FN48] 95-667 (La. App. 4 Cir. 7/10/96), 677 So.2d 1094, 1101-02, underline writ denied, 96-2070 (La. 1/31/97), 687 So.2d 400.

In State v. King,[FN49] the Second Circuit upheld the defendant's sixty-five-year sentence for manslaughter as a second felony offender despite the defendant's claim he had diminished mental ability.  The Second Circuit noted that the trial court considered the defendant's youth and mild mental retardation as mitigating circumstances but that it ultimately focused on the "horror" of the crime, which involved a victim whose skull had been fractured, who had been stabbed over 60 times, and who was left lying in a pool of blood with a knife protruding from his neck.  As for the defendant's claim of mild mental retardation, the trial court had noted that the defendant's limited mental ability did not prevent him from making misleading statements to police to avoid telling them what happened at the victim's apartment on the night of the killing. The Second Circuit found the trial court did not abuse its discretion in sentencing based on the factual circumstances of the case.

> [FN49] 41,084 (La. App. 2 Cir. 6/30/06), 935 So.2d 815, 826.

In the present case, defendant was initially charged with second-degree murder and was convicted of manslaughter in the shooting death of a fourteen-year-old boy.  The record shows the shooting was provoked by an object hitting the car in which defendant was riding.  Defendant exited the car and fired several shots into a crowd of people with no regard for human life.  Despite defendant's youthful age, he had a criminal history consisting of a juvenile adjudication for aggravated assault involving an incident with a knife and his mother.  Additionally, based on the evidence

> presented, defendant's alleged diminished mental ability was questionable.
>
> Based on the circumstances, we cannot find that the trial court abused its discretion in imposing a thirty-five-year sentence despite defendant's youthfulness and his alleged diminished mental ability. The imposed sentence is neither grossly disproportionate to the severity of the offense nor shocking to our sense of justice.[18]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[19]

To the extent petitioner is arguing that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding.  As noted previously, federal *habeas corpus* relief is available only for violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law.  Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998).  Accordingly, this Court will not review the state court's findings regarding the constitutionality of petitioner's sentence under state law.

Further, to the extent that petitioner is claiming that his sentence is excessive under the Eighth Amendment of the United States Constitution, his claim is without merit.  In Solem v. Helm, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts."  United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing

---

[18] Weatherspoon, 948 So.2d at 233-36; State Rec., Vol. XV of XXVIII.

[19] Weatherspoon, 965 So.2d 398; State Rec., Vol. X of XXVIII.

Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)).  "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes."  Gonzales, 121 F.3d at 942 (quotation marks omitted).  "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare."  Id.  (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence.  Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).

The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment."  Gonzales, 121 F.3d at 943.  In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses.  The sentence was imposed under a Texas recidivist statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check.  The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law. Nevertheless, we can say with certainty that the life sentence approved in Rummel falls on the constitutional side of the line,

> thereby providing a litmus test for claims of disproportionate
> punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

In light of the Rummel finding that a *life* sentence was not excessive when imposed for a *nonviolent* offense where the habitual offender had two prior *nonviolent* offenses, all of which were relatively minor offenses, this Court cannot conclude that petitioner's thirty-five-year sentence for the grave crime of manslaughter of a child, a sentence below the maximum sentence available for that crime, is grossly disproportionate. See, e.g., Hutchinson v. Jones, Civ. Action No. 07-356, 2009 WL 2146494, at *5 (M.D. La. July 17, 2009) (forty-year sentence for manslaughter was not grossly disproportionate); Jones v. Cain, Civ. Action No. 08-1585, 2009 WL 928477, at *8-9 (E.D. La. Apr. 3, 2009) (same); Papillion v. Cain, Civ. Action No. 05-1116, 2007 WL 3046063, at *12 (W.D. La. July 31, 2007) (thirty-seven-year sentence for manslaughter was not grossly disproportionate) (adopted by Haik, J., on October 18, 2007). In that the sentence is not grossly disproportionate, this Court's "inquiry is finished." Gonzales, 121 F.3d at 942. Because petitioner's sentence is not so excessive as to violate the United States Constitution, this claim must fail.

### Omission of Responsive Verdict

Petitioner next claims that the trial court erred in failing to include all responsive verdicts when charging the jury. Petitioner was indicted on a charge of second degree murder. Under Louisiana law, there are four responsive verdicts to that charge: "Guilty"; "Guilty of manslaughter"; "Guilty of negligent homicide"; and "Not guilty." La.C.Cr.P. art. 814(A)(3). In the

instant case, the trial court omitted "Guilty of negligent homicide" as a responsive verdict.[20] Petitioner claims that omission violated his rights.

As the state notes in its response, that claim is not cognizable in this federal *habeas corpus* proceeding.  "In a non-capital murder case, the failure to give an instruction on a lesser included offense does not raise a federal constitutional issue." Valles v. Lynaugh, 835 F.2d 126, 127 (5th Cir. 1988); see also Jason v. Cain, Civ. Action No. 04-0882, 2006 WL 2949523, at *14 (E.D. La. Oct. 13, 2006) ("The failure to include a responsive verdict in a noncapital case does not violate federal law.").  Accordingly, the claim must be rejected.

Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel both at trial and on appeal.  The United States Supreme Court established a two-prong test for evaluating such claims.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

---

[20] State Rec., Vol. XXVI of XXVIII, transcript of July 19, 2005, pp. 284-86.

To prevail on the deficiency prong of the <u>Strickland</u> test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  <u>See</u> <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to *trial* counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  <u>Id</u>.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  <u>Crockett</u>, 796 F.2d at 793.  On the other hand, to prove prejudice with respect to a claim that *appellate* counsel was ineffective, a petitioner must show a

reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation.  Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

Petitioner's ineffective assistance of counsel claim was rejected by the state courts in the post-conviction proceedings.  Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decisions rejecting petitioner's claim unless those decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>   A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could

disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S.Ct. 770, 785-86 (2011) (citation omitted).  The Supreme Court then continued:

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Id. at 786-87 (citations omitted; emphasis added).  The Supreme Court then explained that federal *habeas corpus* review of ineffective assistance claims is therefore doubly deferential:

Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest

intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 788 (citations omitted; emphasis added). For the following reasons, the Court finds that, under these stringently deferential standards, it simply cannot be said that relief is warranted in the instant case with respect to petitioner's ineffective assistance of counsel claim.

Petitioner first contends that his trial counsel was ineffective for failing to request that negligent homicide be included as a responsive verdict. With respect to that claim, the Louisiana Fifth Circuit Court of Appeal observed:

Gary Bizal testified [at the state post-conviction evidentiary hearing] that he was relator's trial counsel. Mr. Bizal admitted that he did not specifically request negligent homicide as a responsive verdict during Relator's trial. He could not recall why he did not do so. Mr. Bizal testified that he habitually carries a copy of the Louisiana Code of Criminal Procedure with him to court.

According to Mr. Bizal, Relator claimed that he did not commit the offense for which he was convicted. Relator also claimed that he did not know that his co-defendants were armed. Accordingly, Mr. Bizal attempted to prove to the jury that Relator did not commit an offense. His ultimate goal was to win a verdict of not guilty at trial. According to Mr. Bizal, the evidence presented at trial was not consistent with negligent homicide. The evidence presented at trial indicated that a man intentionally fired a shot into a crowd of people. Mr. Bizal attempted to prove to the jury that Relator was not the man who fired the shot.

Thomas Block testified that he prosecuted relator for this offense at trial. Mr. Block testified that the responsive verdicts with which the jury was charged were the verdicts that would have been supported by the evidence at trial. Mr. Block testified that had Mr. Bizal attempted to raise negligent homicide as a responsive verdict, he would've objected for several reasons. According to Mr. Block, adding the responsive verdict of negligent homicide would have confused the jury. Moreover, negligent homicide was not mentioned during the trial or voir dire. Mr. Block also noted that the evidence developed at trial demonstrated that the offense in this matter involved specific intent, which is not an element of negligent homicide.

Relator testified that the strategy he and Mr. Bizal agreed on at trial was to prove that Relator was not guilty. Relator reiterated that he was not guilty of the offense for which he was convicted. Relator testified that he did not discuss the possibility of waiving negligent homicide as a responsive verdict with Mr. Bizal.[21]

The Court of Appeal then rejected petitioner's claim, holding:

Relator contends that trial counsel was ineffective for failing to ensure that negligent homicide was one of the responsive verdicts provided to the jury. ... The state admits that negligent homicide was not one of the responsive verdicts provided to the jury, but contends that Relator is not entitled to relief because he has failed to meet his burden under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

---

[21] State v. Weatherspoon, No. 09-KH-1010, at pp. 3-4 (La. App. 5th Cir. Feb. 10, 2010); State Rec., Vol. XII of XXVIII.

The test for ineffectiveness of counsel is twofold.  The relator must show that (1) his counsel's performance was deficient, and (2) the deficiency prejudiced him.  Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The error is prejudicial if it was so serious as to deprive the defendant of a fair trial, or "a trial whose result is reliable."  Id. at 687, 105 S.Ct. at 2064.  A reasonable probability must be demonstrated that, but for the error made by counsel, the outcome of the proceedings would have been different.  Id. at 694, 104 S.Ct. at 2068.  Both prongs of the Strickland test must be established before relief can be granted.

There is a strong presumption that counsel's performance is within the wise range of effective representation.  Effective counsel, however, does not mean errorless counsel.  A reviewing court cannot judge counsel's performance based on hindsight, but rather must determine whether counsel was reasonably likely to render effective assistance.  State v. Soler, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075.

In Louisiana, defendants are entitled to have the trial court instruct the jury on the law of the charged offense and on all responsive offenses.  La.C.Cr.P. arts. 803, 814, 815.  La.C.Cr.P. art. 814 lists the responsive verdicts that may be rendered for a number of offenses.  "Guilty of negligent homicide" is listed as a responsive verdict for second-degree murder.  Before the conviction can be reversed on this basis, however, the relator must demonstrate that the inclusion or exclusion of a responsive verdict was prejudicial and that fundamental due process has been violated.  State v. Reese, 472 So.2d 76, 77-78 (La. App. 5th Cir. 1985); State v. Williams, 632 So.2d 351, 359 (La. App. 1st Cir. 1993).

In this case, nothing presented to this Court supports Relator's assertion that he was prejudiced due to the trial court's failure to include negligent homicide as a responsive verdict.  Nor does anything in the application suggest that the jury would have found relator guilty of negligent homicide. La.R.S. 14:32 defines negligent homicide in pertinent part as "[t]he killing of a human being by criminal negligence."  The state argued that Relator had the specific intent to kill the victim.  Defense counsel's strategy was to try and convince the jury that Relator was not guilty of the crime for which he was convicted, not that Relator killed the victim by criminal negligence. Relator and the assistant district attorney who prosecuted him acknowledged the defense strategy during the evidentiary hearing.  An attorney's trial strategy is entitled to deference and does not rise to the level of ineffective assistance unless it is outside the

wide range of professionally competent assistance.  <u>Strickland</u>, 466
U.S. 689-90, 104 S.Ct. at 2065-2066.

Moreover, in <u>State v. Henry</u>, 449 So.2d 486, 489 (La. 1984),
the Supreme Court of Louisiana noted that "[a] trial judge is required
to charge the jury as to the law applicable to the case, under which he
is required to cover every phase of the case supported by the
evidence."  In this case, the evidence does not support a negligent
homicide verdict.[22]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning

additional reasons.[23]  For the following reasons, it is evident that the state court decision rejecting

petitioner's claim was neither contrary to nor involved an unreasonable application of clearly

established federal law.

It has long been noted:

A decision to forgo a charge on lesser included offenses is strategic
in nature.  Strategic choices made after reasonable investigation will
seldom if ever be found wanting, because we are reluctant to second-
guess matters of trial strategy simply because the chosen strategy has
failed.

<u>Lake v. Portuondo</u>, 14 Fed. App'x 126, 128 (2nd Cir. 2001) (internal citations and quotation marks

omitted); <u>see also</u> <u>United States</u> <u>ex rel.</u> <u>Webster v. DeTella</u>, 965 F.Supp. 1124, 1132-33 (N.D. Ill.

1997) ("As for the decision not to offer a jury instruction on a lesser included offense, that is within

the realm of trial strategy, an area in which Monday morning quarterbacking is discouraged. ... That

[counsel's] strategy misfired is no proof of ineffectiveness; even the best trial attorney may misjudge

---

[22] <u>Weatherspoon</u>, No. 09-KH-1010, at pp. 4-5; State Rec., Vol. XII of XXVIII.

[23] <u>State v. Weatherspoon</u>, 49 So.3d 397 (La. 2010) (No. 2010-KP-549); State Rec., Vol. XXVIII
of XXVIII.

trial strategy on occasion.").  Further, such a strategy may validly be employed if defense counsel

feels that he can establish reasonable doubt with respect to the charged offense:

> Submission of lesser included offenses may give the jury a basis for finding a defendant guilty of a crime where the prosecution was unable to prove the elements of the original crime charged beyond a reasonable doubt.  Counsel may have appropriately wished to avoid this possibility and this decision therefore did not constitute ineffective assistance of counsel.

Colon v. Smith, 723 F.Supp. 1003, 1008 (S.D.N.Y. 1989).  "Additionally, counsel's failure to push

for inclusion of a special charge on a lesser offense may result from an equally valid strategic choice

to avoid a possible compromise verdict, opting instead to try to obtain a hung jury or an outright

acquittal."  Parker v. Cain, 445 F.Supp.2d 685, 709 (E.D. La. 2006); see also  Smith v. Terrell, Civ.

Action No. 09-3791, 2009 WL 4799190, at *7 (E.D. La. Dec. 7, 2009).  Therefore, in the instant

case where the defense was that petitioner was not armed and counsel's stated goal was to win an

outright acquittal, this Court cannot say that counsel's failure to press for the additional responsive

verdict constituted deficient performance.

       Petitioner next contends that his trial counsel was ineffective for failing to file post-

trial motions challenging his conviction and sentence.  For the following reasons, it is apparent that

this claim has no merit.[24]

---

[24] The state argues that this claim is procedurally barred because it was rejected by the state courts on the basis that it was waived because petitioner failed to assert it on direct appeal. Regarding procedural bars, the United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy

As for counsel's failure to file post-trial motions challenging the legitimacy of the *conviction*, that failure did not constitute deficient performance and petitioner suffered no prejudice because, as previously discussed, the overwhelming evidence was clearly sufficient to support the conviction.  Wiltz v. Louisiana, No. 04-30017, 1994 WL 286254, at *5 (5th Cir. June 22, 1994) (counsel is not ineffective for failing to file a post-verdict motion for judgment of acquittal as long as the evidence was sufficient to support the verdict); Page v. Rader, Civ. Action No. 10-1724, 2011 WL 1226477, at *6-7 (E.D. La. Mar. 14, 2011), adopted, 2011 WL 1213169 (E.D. La. Mar. 29, 2011); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *26 (E.D. La. 2009), aff'd, No. 09-30807, 2011 WL 1792073 (5th Cir. May 11, 2011); Nicks v. Cain, Civ. Action No. 04-0519, 2005 WL 1578024, at *13 (E.D. La. June 30, 2005).

_____

> the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and *the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.*  This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted; emphasis added).

       The bar invoked here is not strictly and regularly followed with respect to ineffective assistance claims.  On the contrary, Louisiana state courts routinely refuse to consider ineffective assistance claims on direct appeal, noting that generally such claims should instead be asserted in post-conviction proceedings.  See, e.g., State v. McCoy, 34 So.3d 1145, 1151 (La. App. 2nd Cir. 2010) ("As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief ('PCR') in the trial court than by appeal.  This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930.").  Therefore, this claim would not appear to be procedurally barred.

       Nevertheless, in any event, a federal court need not decide whether a claim is procedurally barred if the claim clearly fails on the merits.  Glover v. Hargett, 56 F.3d 682, 684 (5th Cir. 1995); Wiley v. Puckett, 969 F.2d 86, 104 (5th Cir. 1992); Corzo v. Murphy, Civ. Action No. 07–7409, 2008 WL 3347394, at * 1 n. 5 (E.D. La. July 30, 2008); Lee v. Cain, Civ. Action No. 06–9669, 2007 WL 2751210, at *9 (E.D. La. Sept. 18, 2007). Because petitioner's claim is clearly meritless, the undersigned recommends that it simply be denied on that basis.

However, counsel's failure to file a motion for reconsideration of his *sentence* is, at first blush, more problematic.  Because no such motion was filed, petitioner was limited to a bare review of his sentence for constitutional excessiveness.[25]  Liberally construed, it appears that petitioner is claiming that the failure therefore precluded him from challenging his sentence on the basis that the trial judge did not fully consider the mitigating factors set forth in La.C.Cr.P. art. 894.1.  See, e.g., State v. Hebert, 996 So.2d 688, 690 (La. App. 3rd Cir. 2008) (claim alleging noncompliance with article 894.1 was precluded by failure to raise that issue in a motion for reconsideration of sentence).  Even so, in the instant case, petitioner clearly was not prejudiced by counsel's failure.  Even if such a claim had been preserved for review by the Court of Appeal, it would not have warranted relief for the following reasons.

Under Louisiana law, a trial court is to indicate in the record that it considered both the aggravating and mitigating factors of article 894.1 in particularizing a sentence to a defendant.  See, e.g., State v. Jones, 29 So.3d 689, 693 (La. App. 3rd Cir. 2010).  That said, "[t]he court need not go through all of the aggravating and mitigating circumstances so long as the record reflects that he adequately considered the article's guidelines."  Id. (quotation marks omitted).  A trial judge's specific reference to the factors he considered is sufficient to show that he adequately considered article 894.1.  Id.

---

[25] Weatherspoon, 948 So.2d at 233; State Rec. Vol. XV of XXVIII; see also La.C.Cr.P. art. 881.1(E).

In the instant case, it is evident from the transcript that the trial judge adequately complied with article 894.1.  After an extensive sentencing hearing, and considering the argument of counsel, the trial judge stated:

> I'm going to make a couple of comments first about the hearing that we've had today.  I'm going to take note of Dr. Powanda's testimony and her report, but I've got some concerns about it for several reasons.  She doesn't remember a lot about it, is part of the problem.  She doesn't have any notes.  She's just doing from a brief review of this.   She does not remember Mr. Weatherspoon.  This was a test that was done two and a half to three and a half hours and even she admits that she thinks his IQ is probably higher than the reports reflect.
>
> She had no school records.  It seems to me that I apparently have a little more faith in the Jefferson Parish School System than Mr. Bizal does.  But he was apparently in the school system for a period of time and we don't have any of those – the test results which I'm sure they did over the years, of Mr. Weatherspoon.  We don't have the benefit of any of those things and he was in – he was not in special ed.  She also did this report for placement purposes, so her goal was that, rather than a lot of other things that we could consider.
>
> I have taken it into account.  There's lots of things that I can take into account in a sentencing.  But in this case a child was killed. A family is devastated, as certainly we can all imagine.  I suspect Mr. Weatherspoon's family is also devastated as the result of his actions in this.  But the thing that I have to, I think, key in on it as a result of this hearing today is certainly what Mr.  Block suggests, is the testimony of Mr. Weatherspoon during this trial.
>
> He handled himself extremely well and I know this is – he was 19 at the time or 18 at the time of the trial, and he's matured and all of that, but he handled himself extremely well in the trial, both as a result of the direct and of the cross-examination, better than anyone I can imagine who perhaps has an IQ of 60 or 55.  He was almost well spoken.
>
> I recall it, and again, you know Mr. Bizal you mentioned age and that's also something I have to consider.  And yes, he was 16 at the time this was committed, but if he was doing this kind of thing at 16, what can we expect of him when gets older? Maybe worse.  And that concerns me, too.  But I have a death here.  I have a child, a child who will never be able to grow up in any environment.  And I

> certainly have sympathy for both families, but anything that I do
> today has nothing to do with sympathy.  It has to do with what I think
> should be done with people who kill other people.[26]

It is therefore apparent that the trial court gave adequate consideration to the factors listed in article

894.1.  Moreover, as Louisiana courts have noted:

> [A] trial judge is in the best position to consider the aggravating and
> mitigating circumstances of a particular case, and, therefore, is given
> broad discretion in sentencing.  On review, an appellate court does
> not determine whether another sentence may have been more
> appropriate, but whether the trial court abused its discretion.

State v. Blackmon, 748 So.2d 50, 53 (La. App. 3rd Cir. 1999).

In light of the foregoing, it is evident that even if counsel had filed a motion to

reconsider sentence and this claim had been preserved for review by the Court of Appeal, petitioner

would not have prevailed on the claim because there was no abuse of discretion in this case.

Accordingly, petitioner was not prejudiced by his counsel's failure to file such a motion, and this

ineffective assistance claim should therefore be rejected.

Petitioner also contends that his counsel was ineffective for failing to request that the

jury be admonished to disregard Deantre Jackson's testimony concerning the lie detector test.  As

noted previously in this opinion, during a heated cross-examination, Jackson mentioned that had

passed a lie detector test.  Defense counsel moved for a mistrial, which was denied.  The judge asked

defense counsel if he wanted to request that the jury be admonished to disregard the comment;

however, defense counsel declined out of a fear that it would only draw more attention to Jackson's

---

[26] State Rec., Vol. XXVI of XXVIII, transcript of January 18, 2006, pp. 71-74.

passing comment.[27]  Such a tactical decision to forego an admonishment or curative instruction does not constitute ineffective assistance of counsel.  See, e.g., United States v. Jackson, 918 F.2d 236, 243 (5th Cir. 1990) (finding that it was a reasonable trial tactic "to opt against highlighting [an improper comment] by effectively prompting its reiteration in the course of a curative instruction"); United States v. Walker, 718 F.Supp.2d 576, 588 (M.D. Pa. 2010) (finding that trial counsel's decision not to request a curative instruction because it likely would have drawn more attention to the issue "is the sort of strategic decision made by trial counsel that falls well within the wide range of reasonable professional assistance").[28]

Petitioner further contends that his trial counsel was ineffective for failing to request a mistrial after a juror saw petitioner in shackles during the trial.[29]  This issue is patently frivolous. The transcript reflects that the judge was notified by prison personnel that, after one of the days of trial, a juror was still in the building as petitioner was being escorted away and saw him in handcuffs and shackles.  At defense counsel's request, the judge then questioned juror.  Upon questioning, the juror said that she was in the building making a telephone call but did not remember seeing petitioner:

---

[27] See State Rec., Vol. XXIII of XXVIII, transcript of July 14, 2005, p. 177.

[28] This is especially true when, as here, it is unclear whether the jurors heard or understood the comment.  See supra note 15.

[29] The state contends that this claim is procedurally barred.  However, that contention is doubtful at best, and the Court finds that the claim should instead simply be rejected on the merits.  See supra note 24.

MR. BIZAL:
    ... [D]id you see the defendant at all, as you were sitting down there?

JUROR LESLIE COTTON:
    I don't believe I did, no.

MR. BIZAL:
    When he came downstairs you did see him?

JUROR LESLIE COTTON:
    Uh-uh, I don't think I did.  I was on the telephone waiting for a car.

THE COURT:
    Okay.

MR. BIZAL:
    Okay.  That's okay.

THE COURT:
    That's all I needed to know.[30]

Because the juror did not in fact see petitioner in shackles, there obviously was no basis for counsel to move for a mistrial.  Accordingly, counsel was not deficient for failing to make such a motion, and petitioner suffered no prejudice.

Lastly, petitioner contends that his appellate counsel was ineffective for failing to challenge on direct appeal the trial court's failure to include negligent homicide as a responsive verdict.  In rejecting that claim, the Louisiana Fifth Circuit Court of Appeal observed:

Holli Herrle-Castillo testified [at the state post-conviction evidentiary hearing] that she is an attorney employed by the Louisiana Appellate Project and that she represented Relator on his appeal.  She identified defense Exhibit 1 as a brief that she filed on Relator's behalf.  The

---

[30] State Rec., Vol. XXIV of XXVIII, transcript of July 18, 2005, p. 11.

brief contained four assignments of error:  (1) the trial court erroneously allowed the state to introduce "other crimes" evidence, (2) the trial court erred by denying his motion for mistrial, (3) the evidence produced by the state at trial was insufficient to support Relator's conviction; and (4) the sentence imposed by the trial court was excessive.

Ms. Herrle-Castillo testified that she did not brief the trial court's failure to include negligent homicide as a responsive verdict. Ms. Herrle-Castillo testified that she did not raise that issue because the record did not support the verdict.  Ms. Herrle-Castillo recalled the trial counsel failed to make a contemporaneous objection to the jury instruction.  She felt that the four assignments of error she asserted were more viable on appeal.[31]

As previously noted, the Court of Appeal agreed that the evidence would not have supported a verdict of negligent homicide.  The court further agreed that the claim would have been barred on appeal by La.C.Cr.P. art. 841(A) due to trial counsel's failure to lodge a contemporaneous objection.  Accordingly, the Court of Appeal rejected the claim that petitioner's appellate counsel was ineffective.[32]  The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[33]

As an initial matter, it must be remembered that "[c]ounsel is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)." West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996).  As the United States Supreme Court has noted, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most

[31] Weatherspoon, No. 09-KH-1010, at p. 2; State Rec., Vol. XII of XXVIII.

[32] Id. at pp. 5-6.

[33] Weatherspoon, 49 So.3d 397; State Rec., Vol. XXVIII of XXVIII.

on a few key issues." <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983).   Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." <u>Id</u>. at 753.   Moreover, "generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." <u>Kossie v. Thaler</u>, No. 09-20581, 2011 WL 1659395, at *3 (5th Cir. Apr. 28, 2011) (brackets and quotation marks omitted).

Further, in the instant case, it is evident that petitioner's claim fails for the two reasons noted by the state courts.   First, because the evidence at trial would not have supported a verdict of negligent homicide, that responsive verdict was properly excluded.   <u>See, e.g.</u>, <u>State v. Newton</u>, 973 So.2d 916, 919 n.2 (La. App. 2nd Cir. 2007) ("If there is no evidence reasonably supporting a verdict, then such a verdict may be excluded as a possible responsive verdict."); <u>State v. Loyden</u>, 899 So.2d 166, 173 (La. App. 3rd Cir. 2005) (same).   Second, in any event, appellate counsel was precluded from raising this claim because there had been no contemporaneous objection at trial.   La.C.Cr.P. art. 841(A); <u>Newton</u>, 973 So.2d at 919-20; <u>State v. Morris</u>, 917 So.2d 633, 639-41(La. App. 5th Cir. 2005).   Therefore, appellate counsel was not deficient for failing to raise the issue on appeal, and petitioner suffered no prejudice.   Accordingly, petitioner's instant claim fails because he cannot show a reasonable probability that he would have prevailed on appeal if the issue had been raised.   <u>Briseno v. Cockrell</u>, 274 F.3d 204, 207 (5th Cir. 2001); <u>see also</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 286 (2000).

For all of these reasons, the Court finds that petitioner's claim that his trial and appellate counsel were ineffective should be rejected.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition of **Pierre Weatherspoon** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[34]

New Orleans, Louisiana, this eighth day of July, 2011.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[34] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.